432 So.2d 209 (1983)
STATE of Louisiana
v.
Avery C. "Pete" MOORE.
No. 82-KA-1709.
Supreme Court of Louisiana.
April 4, 1983.
Rehearing Denied June 24, 1983.
*211 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Edwin O. Ware, Dist. Atty., R. Greg Fowler, Asst. Dist. Atty., for plaintiff-appellee.
Stephen E. Everett, Alexandria, for defendant-appellant.
BLANCHE, Justice.
Defendant Avery C. "Pete" Moore was convicted of first degree murder for the shooting death of Harold Austin, a violation of LSA-R.S. 14:30. Following the sentencing hearing, the jury of twelve recommended unanimously that the defendant be put to death, and the trial court sentenced him accordingly. In reaching its conclusion, the jury found the existence of the following aggravating circumstances: (1) the defendant had been engaged in the perpetration of an armed robbery and an aggravated kidnapping at the time he killed the victim, and (2) the offense had been committed in an especially cruel manner. La.C. Cr.P. art. 905.4, §§ (a), (g). In appealing his conviction and sentence, the defendant argues eight of the twenty-six errors assigned with the trial court.[1]

FACTS[2]
Shortly after closing his store at 10:00 p.m. on January 17, 1981, Harold Austin, manager of a Shop-Mor convenience store in Tioga, Louisiana, was abducted at gunpoint. About thirty to forty-five minutes later, his body was discovered alongside a rural road in Ball, Louisiana, a small community a few miles from Tioga. He had been robbed of his valuables and shot once in the chest.
At the time of the abduction, Rapides Parish Sheriff's Deputy Bruce Vanderhoeven had been on routine patrol in the Tioga area. Vanderhoeven stopped his patrol car in the parking lot of a "Cotton Patch" family restaurant across the street from the Shop-Mor and observed a gold-colored Buick parked sideways in front of the door. There were four persons in the car and a fifth person at the front of the store, apparently locking the door. The man then hurried to enter the right rear door of the car as it began to slowly roll away. Vanderhoeven believed the man to be Michael Ebey.
*212 The car drove away slowly and Vanderhoeven followed, radioing a request that another unit check the store. A license check showed the vehicle to be registered to Avery Moore of Tioga. Vanderhoeven followed the vehicle for approximately two miles and was able to render descriptions of four of the five occupants. The fifth passenger sat in the middle of the rear seat, slumped low as though he were being pushed down. Vanderhoeven got a particularly good look at the driver and described him as an elderly white man with a receding hairline and glasses.
The other patrol car reported the store to be locked for the evening and Vanderhoeven broke off his surveillance. Still troubled by the incident, Vanderhoeven returned to the Shop-Mor and found Austin's car parked at the far end of the lot with the driver's door open. Austin's body was discovered a short time later. It was ultimately determined that he had died almost instantly from a single gunshot wound caused by a bullet of approximately .38 caliber. The bullet had passed through his body and was never recovered.
At about 2:15 a.m., Vanderhoeven was called to the Tioga substation to aid in the investigation and gave to the investigating officers the above statement facts. Further investigation revealed that the man whom Vanderhoeven had seen run from the door to the car was not Michael Ebey; rather, he was determined to have been a man named Vincent Orlando, who ultimately proved to be the roommate of Avery Moore, the owner of the car. The two resided in Houston, Texas. It was further revealed that Tommy Wren, the roommate of Michael Ebey, was also in the car at the time of the abduction. The fourth person, believed to be a woman, was never positively identified. At about 6:00 a.m. the following morning, Vanderhoeven was shown pictures of Vincent Orlando, whom he identified positively as the man he had seen hurrying from the door to the car, and Avery Moore, whom he identified positively as the driver.
On January 29, 1981, Vanderhoeven gave another statement which was largely repetitive of the first. He also identified photographs of the car belonging to Avery Moore. Further, he selected photographs of the occupants of the car out of photographic lineups. Much later, on March 6, 1982, Vanderhoeven was hypnotized by a state trooper in an attempt to refresh his memory so that he might be able to more particularly identify the woman passenger. However, the hypnosis produced no facts which were not already known to the investigating officers.
On January 19, 1981, the defendant and Orlando were arrested at their residence in Houston. Three .380 caliber cartridges were seized from inside the residence and a box of .380 cartridges was seized from the trunk of a vehicle located at the residence.[3] The defendant's gold-colored Buick was discovered abandoned in a Houston parking lot. The murder weapon was never recovered.

ARGUMENT NO. I

(Assignments of Error Nos. 1, 5, 6)
By these assignments, the defendant argues that he was denied his right to a fair and impartial trial because all jurors who had voiced an opposition to the death penalty, however slight, were automatically excused by the trial court without extensive voir dire to determine whether they were nevertheless qualified to serve. The principal thrust of his argument, as stated in brief, seeks reversal of his conviction.[4]
*213 There is no merit to the defendant's contention that the exclusion of these prospective jurors deprived him of a fair and impartial jury which ultimately resulted in his conviction. Even if we were of the opinion that these veniremen had been improperly excused, such error on the part of the trial court cannot serve as a ground upon which to assail a conviction. Such error may only be asserted to attack the death sentence. Witherspoon v. Illinois, 391 U.S. 510, 522-523, n. 21, 88 S.Ct. 1770, 1776-77, n. 21, 20 L.Ed.2d 776 (1968); State v. Perry, 420 So.2d 139, 143 (La.1982).
In Witherspoon, the United States Supreme Court held that a death sentence could not be constitutionally imposed or recommended by a jury which had been chosen by excluding prospective jurors simply because they had expressed general objections to the death penalty or merely because they had conscientious or religious scruples against its infliction. However, the Court stated expressly that the decision was not meant to foreclose the exclusion of jurors who made it "unmistakably clear" that they would automatically vote against the death penalty under any circumstances. 391 U.S. at 522, 88 S.Ct. at 1777; cf. State v. Perry, supra.
La.C.Cr.P. art. 798 provides:
"It is good cause for challenge on the part of the state, but not on the part of the defendant, that:
* * * * * *
(2) The juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it unmistakably clear (a) that he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him, or (b) that his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt; ...."
This provision was amended in order to conform with Witherspoon.[5] Subsequent jurisprudence has upheld the validity of art. 798, and it is well-settled that prospective jurors may be excused for cause if they indicate that they would not impose the death penalty under any circumstances. State v. Jordan, 420 So.2d 420 (La.1982); State v. Perry, supra; State v. Lindsey, 404 So.2d 466 (La.1981); State v. Francis, 403 So.2d 680 (La.1981); State v. Monroe, 397 So.2d 1258 (La.1981); State v. George, 371 So.2d 762 (La.1979), cert. denied, 444 U.S. 953, 100 S.Ct. 430, 62 L.Ed.2d 325.
In this case, nine prospective jurors voiced an opposition to the death penalty. Of these nine, seven were excused by the court, one was excused on a state challenge for cause, and one was challenged peremptorily by the state. Our review of the voir dire examination shows that the seven veniremen excused by the court and the one venireman excused on a state challenge for cause had each stated unequivocally that he or she could not vote for the death penalty under any circumstances. Therefore, these jurors were properly excused. La.C.Cr.P. art. 798(2); Witherspoon v. Illinois, supra.
Only one prospective juror expressed a general opposition to the death penalty but stated that she would not automatically vote against it. The state challenged her peremptorily. Other than this isolated instance, the defendant has made no showing that the state used its peremptory challenges to systematically exclude veniremen who expressed a general opposition to the death penalty; in fact, the state did not use all of its twelve peremptory challenges. In our opinion, the state's exercise of a peremptory challenge against this one prospective juror did not render the jury "death qualified" or otherwise unconstitutionally tainted within the meaning of Witherspoon.
These assignments are without merit.

*214 ARGUMENT NO. II

(Assignments of Error Nos. 9, 24)
By these assignments, the defendant argues that the trial court erred in admitting the testimony of Deputy Bruce Vanderhoeven. Adopting the arguments of Tommy Wren and Vincent Orlando in State v. Wren, 425 So.2d 756 (La.1983), the defendant asserts that Vanderhoeven's recollection had become so tainted by the hypnosis that his testimony had ceased to be reliable and therefore should have been ruled inadmissible. In overruling the defendant's objection to the testimony, the trial judge ruled that the hypnosis was a factual issue going to the weight to be accorded his testimony rather than to its admissibility. For the reasons assigned in State v. Wren, supra, we agree with that assessment.[6]
Immediately following the incident, Vanderhoeven gave a written statement describing the events which he had observed, including descriptions of the defendant and the other occupants of the car. The statement was admitted into evidence at trial. The morning following the incident, Vanderhoeven positively identified the defendant from a photograph as the driver of the vehicle.
Eleven days following the incident, Vanderhoeven gave another statement which was largely repetitive of the first. This statement was also admitted into evidence at trial. At the time of this second statement, Vanderhoeven identified photographs of the defendant's car. Six weeks later, he was hypnotized in the hope that his memory would be "refreshed" so that he might be able to more particularly describe the woman passenger, but the hypnosis yielded no new information.
At trial, Vanderhoeven testified extensively concerning his observations on the night of the incident. He made in-court identifications of the defendant and photographs of the defendant's vehicle based on those eyewitness observations. He was subjected to vigorous cross-examination as to any effect which the hypnosis may have had on his ability to identify the defendant but remained certain that it was the defendant whom he had seen driving the vehicle that night.
In State v. Wren, supra, we decided this precise issue:
* * * * * *
"We are of the opinion that Vanderhoeven has not been rendered by the hypnosis as incompetent to testify as to his observations on the night of the incident. Since Vanderhoeven's original identification of the defendants had been certain and was not enhanced in any way by the hypnosis, we find it unnecessary to assess squarely the admissibility of hypnotically-induced testimony in criminal cases, i.e., where facts are elicited under hypnosis which were otherwise unknown or not previously revealed by the witness prior to the hypnosis. Here, the hypnosis produced no facts which were not already known to the investigating officers.
* * * * * *
[T]he issue of Vanderhoeven's hypnosis should go to the question of the proper weight to be accorded his testimony rather than to the question of its admissibility. We agree with the assertion that skillful cross-examination will enable the trier of fact to evaluate the effect of the hypnosis on Vanderhoeven's credibility. Additionally, since Vanderhoeven's first two statements provide an independent basis for corroboration of his hypnotic and post-hypnotic statements and identifications, any of the feared risks of "confabulation" and undue suggestion become insignificant. The defendant may always counter the proffered evidence with expert *215 testimony highlighting any questions as to the reliability of Vanderhoeven's testimony due to the hypnosis, thereby casting doubt on his credibility." 425 So.2d at 758-759.
In light of the above ruling, these assignments are without merit.

ARGUMENT NO. III

(Assignment of Error No. 9)
By this assignment, the defendant argues that the trial court erred in allowing Deputy Vanderhoeven to identify him in-court. More specifically, he contends that the trial court granted his pre-trial motion to suppress a pre-trial photographic lineup and that the same basis which had justified suppression of that particular out-of-court identification justified suppression of the in-court identification as well. The defendant asserts that Vanderhoeven testified at trial to no circumstances different from those submitted at the hearing on the motion to suppress, therefore there was not presented at trial a foundation sufficient to support the in-court identification.
We disagree. The trial judge cited these reasons for granting the motion to suppress:
* * * * * *
"I have the testimony and reviewed the transcript presented to me.
The testimony of Bruce Vanderhoeven was basically that he observed a car parked in front of the Shop-Mor. His attention was mainly focused upon the person locking or leaving the door and coming, which happens to be Vincent Orlando as it turned out in his testimony. He did state, on page 52, that he looked at all of the occupants. He gave no description in his testimony of the party who was the driver of the car in that [which] is presented to me.
* * * * * *
He did give some description of him. We have Moore(1) which is a photographic lineup of fourteen people. He is the only one with glasses therein in the age category that he has."

* * * * * *
The "testimony" to which the trial judge referred was the transcript of Vanderhoeven's statement following the incident. At the hearing on the motion to suppress, both the state and the defendant submitted the issue solely on the basis of that transcript. Vanderhoeven gave no live testimony. However, at trial, he testified extensively as to his observations of the defendant as the driver of the vehicle, and the foundation for his in-court identification was far more substantial than the truncated version upon which was decided the motion to suppress.
At trial, Vanderhoeven testified that the Shop-Mor parking lot where he first observed the defendant's vehicle was well-lighted with fluorescent lamps and that all of his attention was focused on the occupants of the car. When the car pulled away from the door, it passed directly in front of him for a short distance with the driver's side toward him before turning away slowly. He followed the car closely, within one or two car lengths, for approximately two miles. The vehicle stopped at no fewer than three well-lighted intersections, and his headlights were on "bright" and flooded the interior of the vehicle. Still further, Vanderhoeven testified:
* * * * * *
Q: "[D]o you have any difficulty in recognizing the person who was driving the car?
A: No, sir. I don't.
* * * * * *
Q: Describe the person that you saw driving that vehicle.
A: The individual looked to me like he was about fifty(50) to fifty-five(55) years old. He wore glasses and the position where I was at behind the car, I could see probably three-quarters of his face. The area was well illuminated. I got a real good look at the individual that was driving the car.
Q: [D]o you see the person today?

*216 A: Yes, sir.
Q: [W]ould you point him out to the jury?
A: The defendant sitting right over here.
* * * * * *
Q: Any doubt ... in your mind as to who you have identified?
A: No, sir."

* * * * * *
There is ample evidence in the record to establish that Vanderhoeven's in-court identification had a basis independent of the pre-trial photographic lineup, even if that lineup were to be considered suggestive. His in-court identification was based solely on his observations the night of the incident. The strength of the foundation established at trial eliminated any chance of misidentification which might have proved violative of due process. cf. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); State v. Long, 408 So.2d 1221 (La.1982); State v. Guiden, 399 So.2d 194 (La.1981); State v. Doucet, 380 So.2d 605 (La.1977); State v. Vaughn, 378 So.2d 905 (La.1979).
This assignment is without merit.

ARGUMENT NO. IV

(Assignment of Error No. 19)
By this assignment, the defendant argues that the trial court erred in refusing to allow the jury to view the crime scene. More specifically, he urges that the jury should have been allowed to view the scene and trace the route followed by Deputy Vanderhoeven under conditions similar to those on the night of the murder, since Vanderhoeven's ability to observe and identify him was very much at issue.
The trial judge based his refusal on the grounds that it would have been virtually impossible to recreate the exact scene and lighting conditions as they had existed on the night of the incident and would have entailed placing each juror in a police cruiser late at night. Furthermore, the trial judge noted that the jury had been supplied with pictures of the scene, a map of the scene and the route followed by Vanderhoeven, and ample testimony as to the lighting conditions. Moreover, Vanderhoeven had been subjected to cross-examination at length concerning the lighting conditions.
It is well-settled that the decision regarding whether to grant or deny a motion to have the jury view the scene of the crime is within the sound discretion of the trial court, and such a ruling will not be disturbed on appeal absent an abuse of that discretion. La.C.Cr.P. art. 762(2); State v. Johnson, 404 So.2d 239 (La.1981), cert. denied, Kelly v. Louisiana, 456 U.S. 925, 102 S.Ct. 1970, 72 L.Ed.2d 440 (1982); State v. Gallow, 338 So.2d 920 (La.1976); State v. Nix, 327 So.2d 301 (La.1976), cert. denied, Fulford v. Louisiana, 425 U.S. 954, 96 S.Ct. 1732, 48 L.Ed.2d 198.
Given the circumstances of this case, the trial court did not abuse its great discretion in denying the motion. The logistics involved made compliance with the request virtually impossible without a wholesale disruption of the proceedings. Furthermore, there was ample evidence before the jury which made clear the layout of the crime scene, the route followed by the two vehicles, and the lighting conditions under which Vanderhoeven had observed the incident. It was not necessary for the jury to view the scene in order for the defendant to receive a fair and impartial trial.
This assignment is without merit.

ARGUMENT NO. V

(Assignment of Error No. 25)
By this assignment, the defendant urges that there is insufficient evidence to support the verdict of guilty of first degree murder because the state presented no evidence which established that he had been personally involved in the abduction or that he had personally killed the victim.[7] We find these arguments unpersuasive.
*217 LSA-R.S. 14:30 defines first degree murder as:
"[T]he killing of a human being:
(1) When the offender has the specific intent to kill or inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, aggravated escape, aggravated arson, aggravated rape, aggravated burglary, armed robbery, or simple robbery;"
The proper standard of appellate review for a sufficiency claim is whether, "after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Long, 408 So.2d 1221 (La. 1982). Where the evidence against the accused is circumstantial, the standard is whether, taking as proved all facts which the evidence tends to prove, every reasonable hypothesis of innocence has been excluded. LSA-R.S. 15:438; State v. Graham, 422 So.2d 123 (La.1982); cf. State v. Buxton, 416 So.2d 71 (La.1982); State v. Ennis, 414 So.2d 661 (La.1982); State v. Austin, 399 So.2d 158 (La.1981).
As we noted in State v. Graham, supra, a combining of these two standards could lead to an impermissible blurring of the proper role appellate courts should assume in evaluating sufficiency claims in a circumstantial evidence cases:
"In previous opinions we have attempted to formulate a single precept incorporating both standards. See, e.g., State v. Austin, 399 So.2d 158 (La.1981). ("Therefore, when we review a conviction based upon circumstantial evidence we must determine that, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have concluded beyond a reasonable doubt that every reasonable hypothesis of innocence had been excluded." Id. p. 160). Upon further reflection, however, a merger does not appear to promote clarity but could lead to a distortion of the standards. A combination of the rules may incorrectly imply that, when all of the evidence of the defendant's guilt is circumstantial, due process requires more than evidence which would satisfy any rational juror of proof of guilty beyond a reasonable doubt. On the other hand, an in-tandem articulation may seem improperly to diminish the requirement of the circumstantial evidence rule by implying that, in a close case, this court will defer to the jury's finding rather than follow its own determination of whether there is a reasonable hypothesis of innocence. Although in many instances separate and dual applications of the rules will yield the same result, out of an abundance of caution we will proceed to apply each standard separately, as it was given to us by the framers." Id. at 129.
Proceeding with the "abundance of caution" we spoke of in Graham, we will apply each standard separately to the facts of this case.
Here, the evidence against the defendant, albeit circumstantial, is overwhelming.[8]
Margaret Weems, the defendant's niece, testified at trial that the defendant had told *218 her a week to ten days prior to the murder that he intended to rob the Shop-Mor, shoot Harold Austin "in the back", and "throw him in a road ditch." Mrs. Weems and her son, Carl, both testified that the defendant owned a .380 caliber pistol. On the same day that the defendant told Mrs. Weems of his intention to rob and kill Harold Austin, the defendant and Vincent Orlando visited the Weems household and gave to Mrs. Weems a .380 caliber pistol and a 9 millimeter automatic for her to hold while they were at the house. Mrs. Weems testified that the defendant and Orlando took the guns with them when they left the next day, wrapping them in a small towel.
Mrs. Weems testified further that when she informed the defendant that he was being sought in connection with the murder, he stated, "The old S.O.B. is dead and there isn't any witnesses." Mrs. Weems also testified that the defendant told her that "there wasn't any woman involved" when she told him that her children had advised her that the police might want to question her about the incident.
Ralph Guy, Linda Reed's ex-boyfriend, testified that the defendant was supposed to have been babysitting Linda's three children at her residence from about 4:00 p.m. on the evening of the murder, but that the defendant was not there when he went to the residence between midnight and 1:00 a.m. Guy had received several calls from the children earlier in the evening. Mrs. Weems testified that she had been calling the residence from about 6:00 p.m. to 9:00 p.m. on the night of the murder looking for the defendant, last trying at 9:09 p.m., but "it was a kid kept answering the phone." She finally reached the defendant at about 4:00 a.m., and she testified that he said he "had just come in ... [from] out trying to score some money." Mrs. Weems testified that it usually took about four hours to drive from Tioga to Houston.
Earnest O'Dell, a disc jockey at a Houston nightclub, testified that he was approached at the club by the defendant and Vincent Orlando the night after the murder and that the defendant told him to tell the police that he (Moore) had been in the club on the night of the incident because they were trying to "pin a rap on him" for a murder in Louisiana. O'Dell's testimony was corroborated by the club's owner, Robert Fields, who testified that he had seen the defendant and Orlando approach O'Dell at the club on the night following the killing. Laura Simms, a dancer at the club, testified that she was also approached by the two and that the defendant told her not to say anything about his presence in Louisiana on the night of the murder.
Mrs. Austin, the victim's wife, testified that her husband had told her about a week before the murder that Michael Ebey had told him that there might be a robbery attempt at the store. Ebey testified that he learned of the defendant's plan to rob and murder the victim a few days prior to the incident from Mrs. Weems daughter, Karen. Mrs. Austin accounted for her husband's possessions as he left for work the afternoon of the killing and testified that he had carried with him $230 in cash (which was to be deposited in their savings account on Monday), a .38 caliber pistol, a pocketknife, and the combination to the store safe. These items were missing from Austin's body.
James Milligan, the last customer to see Harold Austin alive, testified that he left the store just minutes before closing time and observed the defendant's vehicle to the left side of the store, out of view from anyone inside, at approximately 10:00 p.m. At trial, he identified photographs of the defendant's car as the vehicle he had seen beside the store. Deputy Vanderhoeven gave extensive testimony concerning his observations on the night of the incident and made a positive in-court identification of the defendant as the driver of the vehicle. Larry Craven, who lived approximately 100 yards from where the victim's body was found testified that he heard a single gunshot at about 10:30 p.m. on the night of the murder. Raymond Cooper, a criminalistics expert, testified that plaster casts of tire imprints found near the body matched by class the tires on the defendant's vehicle.
*219 Viewing this great body of evidence in the light most favorable to the prosecution, we must conclude that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. The evidence is uncontroverted that the victim was robbed of his valuables at gun-point and shot to death. Specific intent may be inferred from the circumstances of the transaction. LSA-R.S. 15:445; State v. Motton, 395 So.2d 1337 (La.1981). Given the extensive testimony concerning the defendant's prior threats to rob and kill the victim, any rational trier of fact could have concluded that the defendant shot the victim with specific intent to kill while engaged in the perpetration of an armed robbery.[9]
Since no witness actually saw the defendant shoot the victim, the evidence against him is circumstantial. However, again viewing this great body of circumstantial evidence, and, taking as proved each fact which the evidence tends to prove, we must conclude that every reasonable hypothesis of innocence has been excluded. Indeed, the defendant presented no evidence from which any other reasonable hypothesis might be drawn; rather, he chose to rest on his right not to present any evidence in his behalf. cf. State v. Graham, supra.[10]
This assignment has no merit.

REVIEW OF THE PENALTY PHASE
Under La.C.Cr.P. art. 905.9, we are required to review each death sentence to determine whether it is excessive. Pursuant to the mandate of that provision that this court establish procedures to satisfy constitutional criteria for such review, Supreme Court Rule 28, § 1 provides:
"Every sentence of death shall be reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court shall determine:
(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."
In compliance with Rule 28, § 3, the trial judge submitted a Uniform Capital sentencing report which revealed the following facts: The defendant is a 64 year old white male with an eleventh grade education and low intelligence level (IQ 70). He is a diabetic and had his right leg amputated while in prison awaiting trial due to complications with the disease. He worked as a pipefitter from 1939-1967.
The defendant had three convictions prior to the present offense: a 1947 conviction for cow theft, for which he was sentenced to six months in jail; a 1948 conviction for theft of a government property, for which he was placed on three years of federal probation; a 1967 conviction for manslaughter, for which he was sentenced to 21 years.[11] The defendant served eleven years of that sentence and committed the instant offense within two years of his release from Angola.
Passion, prejudice or other arbitrary factors
In his sentence review memorandum, the defendant argues that the jury was pre-disposed *220 toward imposition of the death sentence because the trial court had improperly excused any juror who had expressed an opposition to the death penalty. cf. Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). For the reasons assigned in our disposition of Argument No. I, supra, this contention is without merit.
All nine jurors who had expressed an opposition to the death penalty were properly excused. The trial court questioned each extensively in order to be certain that each could not impose the death penalty under any circumstances. The one prospective juror who expressed only a general objection to the death penalty was challenged peremptorily by the state. As we noted earlier, this isolated instance of a state peremptory challenge against such a prospective juror did not render the jury unconstitutionally tainted within the meaning of Witherspoon.
The defendant argues further in memorandum that the state engaged in "prosecutorial rhetoric" during closing argument at the penalty phase in an attempt to inflame the emotions of the jury to ensure that it would recommend the death penalty. Specifically, he contends that the state improperly asked the jury to return a death recommendation because "[j]ustice has been waiting for years for this penalty." The prosecutor made the comment in the following context:
* * * * * *
"You have to return the death penalty unanimously. Twelve heads, twelve people, twelve opinions. Go in the back and deliberate for just a short period. Please return a verdict. Justice has been waiting for years for this penalty. Since January of 1981, the state has been waiting for the appropriate penalty to be imposed in this case and the state submit [sic] from the evidence that it's murder during an armed robbery and that the only penalty you can therefore find properly under your duty as a juror is death as the sentence." (emphasis supplied)

* * * * * *
The defendant contends that this portion of the argument served as a commentary on the fact that it had been a long time since a death sentence had been imposed in Rapides Parish, intimating that the commentary served to pressure the jury into shouldering the responsibility for re-instituting the death penalty in Rapides Parish, even if this were not the appropriate case. We find this argument unpersuasive.
La.C.Cr.P. art. 774 provides:
"The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
The argument shall not appeal to prejudice.
The state's rebuttal shall be confined to answering the argument of the defendant."
The general rule with regard to improper argument is whether the jury was influenced by the remarks and whether the remarks contributed to the verdict. State v. Monroe, 397 So.2d 1258 (La.1981). Where the death penalty has been imposed, however, we are not to be constrained by the general doctrine of reversible error; we must determine whether the argument injected into the penalty proceeding passion, prejudice or any other arbitrary factor which contributed to the jury's recommendation of the death penalty. La.Sup.Ct. Rule 28, § 1(a); State v. Lindsey, 404 So.2d 466 (La.1981); State v. Monroe, supra.
In our view, the prosecutor's comment that "[j]ustice has been waiting for years for this penalty" was fairly within the permissible scope of closing argument, even in a death penalty case, and did not serve to incite the passions of the jury, prejudice the defendant, or constitute an arbitrary factor which weighed unduly in the jury's deliberations.
The reasonable interpretation of the prosecutor's comment is that the state has been waiting for years for the death penalty to be imposed in this case. It is not improper argument for the state to request that the jury return a recommendation of death. cf. *221 State v. Lewis, 156 La. 985, 101 So. 386 (1924); State v. Reeves, 129 La. 714, 56 So. 648 (1912). In our opinion, the prosecutor's comment was merely a request that the jury return a recommendation of death and did not serve to pressure the jury into re-instituting the death penalty in Rapides Parish irrespective of the merits of this particular case.
In addition, the defendant found the following passage from the state's argument particularly objectionable:
* * * * * *
"Think of the fear that was then present for a man that was going to see his wife, but then he's a victim of a crime. Watch Mr. Austin get in the car, being shoved in. Watch him being held down. Feel what he felt from the evidence from being held in place with people on both sides, armed with weapons, seeing help just a little bit away, the Deputy Sheriff's car, without being able to call out and not being able to get a message off."
Following the particular passage cited by the defendant, the argument continued as follows:
* * * * * *
"The terror of being captive in a car with people with guns taking money from him and his own personal weapon that he had in order to prevent someone from robbing him, the combination to the safe and his knife.
Drive with him on the route that you saw on the map pleading for mercy, terrorized, held in place.
Continue on and see the Deputy Sheriff not having enough to stop the car because the store is secured, the store that they secured. Watch that Deputy Sheriff car leave.
The last thought: God, I'm by myself.
Continue on for approximately three more miles to the scene at Burma Road. Held in the back seat. Feel the thoughts. Feel the feelings. All I have is four kids and a wife that I want to go home to. I never asked for this.
The car stops, he's pushed out, walked out ... Mr. Austin is not here to tell us what happened, but we know one thing. He's shot in the back. Shot in the back and left to die by bleeding to death.
Death isn't pretty. It wasn't pretty that night at the scene when I walked up there, but I'm asking you to look at something because I don't know how close you looked at it, but as he lay there in the ditch, he has the face of death. The victim knew he was dying. Shot and bleeding to death from the gunshot wound administered to him by the defendant and his co-defendants. That's fear. That's pain. That's suffering."

* * * * * *
The thrust of the state's argument asked the jurors to place themselves in the shoes of the victim. The prosecutor also described the victim's death. The defendant asserts that the prosecutor thereby "[took] the jury on a trip where no evidence before it had gone; [and asked] it to experience emotions about which there was no evidence...." He contends that this "prosecutorial rhetoric" was calculated to "incite the passions of this `capital jury.'" We likewise find this argument unpersuasive.
While the prosecutor must base his conclusions and deductions upon the evidence adduced at trial to stay within the parameters of La.C.Cr.P. art. 774, both the state and the defense are entitled to their own conclusions as to what is established by the evidence and may press upon the jury any view arising out of the evidence. State v. Preece, 270 So.2d 850 (La.1972); State v. Alexander, 215 La. 245, 40 So.2d 232 (1949). Statements of the prosecutor referring to the manner in which the victim was killed are within the proper bounds of closing argument. State v. Whitmore, 353 So.2d 1286 (La.1977). At trial, the medical examiner testified by deposition that the victim bled to death within a matter of minutes as a result of the gunshot wound. In our opinion, the reference to the manner of death was appropriate in light of the evidence adduced at trial and did not serve to incite the passions of the jury, prejudice the *222 defendant, or constitute any arbitrary factor which weighed improperly in the jury's deliberations.
As to the request that each juror place himself in the shoes of the victim, our law requires that each juror rely only on his memory of the evidence in reaching a verdict, and in so doing, we necessarily ask that each juror draw upon his general knowledge and experiences in deciding the case. cf. La.C.Cr.P. art. 793; State v. Graham, 422 So.2d 123 (La.1982); see also C. Joseph and R. Lamonica, Louisiana Jury Instructions, Criminal, §§ 2.2, 3.4 (1980). It is not unreasonable to infer from the facts of this case, in the light of ordinary human experience, that the victim underwent a great deal of emotional distress prior to his death. He had been warned sometime prior to the incident that he might be robbed and killed. He was abducted at gunpoint from his store late at night and pushed into the back seat of an automobile occupied by four persons. These persons drove very slowly out into the darkened country side and took from him his valuables. He was made to exit the vehicle into the January cold and stand in the darkness at the edge of a gravel road. He was then shot in the back. These facts are uncontroverted.
It is not beyond the scope of normal human behavior and experience to imagine one's self in the shoes of a crime victim, and it is not inconceivable that many, if not all, of the jurors in this case, in viewing the evidence adduced at trial, took into account the emotions experienced by the victim prior to his death in rendering their verdict and penalty recommendation. We cannot view the prosecutor's argument in any vein other than as an appeal to the jury to apply their general knowledge and experience to the evidence adduced at trial before rendering their recommendation, and we are hereby unwilling to establish a rule which would per se prohibit the state from asking jurors to place themselves in the shoes of the victim. While it is the function of this court to ensure that criminal defendants do not fall prey to a "lynch mob" mentality, we cannot expect jurors to be cold machines devoid of human emotion. We are of the opinion that the prosecutor's request was sufficiently confined to the evidence and any permissible inferences which could have been fairly drawn therefrom within the meaning of La.C.Cr.P. art. 774. We are likewise of the view that the request did not inject into the penalty proceeding any undue passion, prejudice or other arbitrary factor which unfairly influenced the jury's recommendation that the defendant be sentenced to death.
Our further review of the record has disclosed no factors which might have acted as an improper influence on the jury in returning its recommendation. There was no mention of the defendant's potential for future release should he be given life imprisonment, nor were any references made as to appellate review of death sentences. cf. State v. Moore, 414 So.2d 340 (La.1982); State v. Willie, 410 So.2d 1019 (La.1982); State v. Lindsey, 404 So.2d 466 (La.1982); State v. Sonnier, 379 So.2d 1336 (La.1980). Our review of the trial court's instructions at the penalty hearing uncovered no improper instruction which might have injected into the jury's deliberations an arbitrary factor necessitating reversal of the sentence. cf. State v. Brogdon, 426 So.2d 158 (La.1983); State v. David, 425 So.2d 1241 (La.1983); State v. Watson, 423 So.2d 1130 (La.1982).
For these reasons, in accordance with Rule 28, § 1(a), we find that the sentence was not imposed under the influence of passion, prejudice or any other arbitrary factor which might require that we set the sentence aside.
Aggravating circumstances
In returning its recommendation, the jury found two statutory aggravating circumstances: (1) the defendant had been engaged in the perpetration of an armed robbery and an aggravating kidnapping at the time he killed the victim, and (2) the offense had been committed in an especially cruel manner. La.C.Cr.P. art. 905.4, §§ (a), *223 (g).[12] The defendant argues that the evidence is insufficient to support the finding of any aggravating circumstances under art. 905.4, especially the finding of the jury that the offense was committed in an especially cruel manner.
The use of statutory aggravating circumstances as a prerequisite to a recommendation of death serves to provide a uniform structure within which to channel the jury discretion which is so vital to the constitutionality of our capital sentencing scheme. See State v. Sawyer, 422 So.2d 95, 102, n. 13 (La.1982); cf. Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); Zant v. Stephens, 250 Ga. 97, 297 S.E.2d 1, 3 (Ga.1982), on certification from the United States Supreme Court, 456 U.S. 410, 102 S.Ct. 1856, 72 L.Ed.2d 222 (1982). If its discretion were unbridled, the jury might be tempted to go far afield of these constitutionally-charted bounds and render its recommendation based solely on arbitrary factors unrelated to the evidence adduced at trial.
In State v. Sawyer, supra, we held that it is only necessary that the evidence be sufficient to support the existence of one statutory aggravating circumstance forming the basis for the jury's recommendation:[13]
"The adequately supported finding of the existence of one aggravating circumstance is alone sufficient to place defendant in that category of offenders properly *224 exposed to the possibility of the death sentence. (citations and footnote omitted)
Thus, under Louisiana's statutory scheme, the jury at the penalty trial must in effect make two separate but closely related findings in order to recommend a death sentence. The jury must first find the existence of at least one statutory aggravating circumstance as a threshold requirement before even considering imposition of the death penalty. If an aggravating circumstance is found, then the jury must take into account any mitigating circumstances and must make a separate finding regarding whether the death penalty should be imposed, considering both the particular crime and the particular offender. If the jury recommends the death penalty, this court must review each of the two separate jury findings." 422 So.2d at 101-102.
We noted further that should it be ultimately determined that the evidence only supported the existence of one statutory aggravating circumstance, then the fact that the evidence did not support the existence of any additional aggravating circumstances which may have been found by the jury had no effect on the availability of the death penalty for the particular offender; rather, the absence of any additional aggravating circumstances would be pertinent to our review of the sentence in accord with Rule 28, § 1(c), whereby we examine whether the death sentence is appropriate for the particular offender, considering both the circumstances of the crime and the propensities of the individual defendant.[14] 422 So.2d at 102; see our discussion of the proportionality of the sentence imposed in this case, infra.
Based on our review of the record, we agree with the defendant's contention that the evidence is not sufficient to support the jury's finding that he was engaged in the perpetration of an aggravated kidnapping at the time he killed the victim and that the offense was committed in an especially cruel manner; however, for the reasons assigned in our treatment of Argument No. V, supra, we do find the evidence sufficient to support the jury's determination that the defendant was engaged in the perpetration of an armed robbery at the time of the killing.
We have construed La.C.Cr.P. art. 905.4(g) to incorporate the idea that in order to find that the offense was committed in an "especially heinous, atrocious or cruel manner" there must have been some degree of "torture or pitiless infliction of unnecessary pain on the victim." State v. Sonnier, 379 So.2d 1336 (La.1979) (on original rehearing); State v. English, 367 So.2d 815 (La.1979). Generally, physical abuse of the victim is necessary, with death being brought about in a "particularly painful and inhuman manner." State v. Baldwin, 388 So.2d 664 (La.1980); cf. State v. Taylor, 422 So.2d 109 (La.1982); State v. Moore, 414 So.2d 340 (La.1982); State v. Clark, 387 So.2d 1124 (La.1980). Although we can infer from the evidence adduced at trial that the victim was subjected most certainly to a great deal of fear and anguish prior to his murder, the *225 killing was not committed in an especially cruel manner within the meaning of the prior jurisprudence. Therefore, the jury erred in finding this an aggravating circumstance.
Aggravated kidnapping is defined as the forcible seizing and carrying of a person from one place to another with the intent of forcing the victim or some other person to give up anything of present or prospective value in order to secure a release of the person seized. LSA-R.S. 14:44(1); State v. Polk, 376 So.2d 151 (La.1979). Although the evidence establishes that the victim was forcibly seized and deprived of his valuables, the essential element of the crime, intent to deprive in order to secure a release, is missing. There is no evidence in the record from which any rational trier of fact could have concluded that the victim was deprived of his valuables in exchange for his release or promise of release. The crime of aggravated kidnapping is limited to cases of kidnapping for ransom (i.e., kidnapping with intent to extort). LSA-R.S. 14:44, comment; State v. English, 367 So.2d 815, appendix at 823 (La.1979). Therefore, the jury erred in finding aggravating kidnapping as an aggravating circumstance under La.C.Cr.P. art. 905.4.
As we noted earlier, however, the jury's finding that the murder was committed during the perpetration of an armed robbery is clearly supported by the evidence. The victim left his home on the day of the killing with $230 cash, the combination to the store safe, a .38 caliber pistol, and a pocketknife. These items were missing from the victim's body. Witnesses testified that the defendant had threatened to rob the victim, "shoot him in the back, and throw him in a road ditch," and that he stated, "The old SOB is dead and there isn't any witnesses," when he was told that the police were seeking him in connection with the killing. The evidence was such that any rational trier of fact could have concluded that the state had proved, beyond a reasonable doubt, that the defendant had shot the victim with the specific intent to kill during the perpetration of an armed robbery.
For these reasons, in accordance with Rule 28, § 1(b), we find that the evidence supports the jury's finding of a statutory aggravating circumstance.
Proportionality of sentence
The final step in our sentence review calls for our determination as to whether the sentence is "disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Rule 28, § 1(c). Since an inference of arbitrariness arises when the jury's recommendation is inconsistent with sentences imposed in similar cases from the same jurisdiction (see State v. Sonnier, 380 So.2d 1 (La.1979)), our review generally entails a comparison and analysis of other cases involving similar facts. However, the defendant also urges that the death penalty may not be constitutionally imposed against him in light of the recent United States Supreme Court ruling in Enmund v. Florida, ___ U.S. ___, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).
In Enmund, the high court held that the death penalty constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments where the condemned "neither took life, attempted to take life, nor intended to take life." 102 S.Ct. at 3371. The defendant, Earl Enmund, had been convicted of first degree murder, as was a co-defendant. The co-defendant and a woman robbed and killed two elderly persons after appearing at the door of their farmhouse pretending to have an overheated car. Enmund waited at the road in the getaway car. The high court held that even though Enmund had been properly convicted of first degree murder under state law, the death penalty, which is "unique in its severity and irrevocability," constituted an "excessive penalty for the robber, who, as such, does not take human life." Id., 102 S.Ct. at 3377.
We find Enmund clearly distinguishable from the instant case. The defendant's argument that the death penalty may not be constitutionally imposed against him is predicated upon our finding that the evidence *226 is insufficient to support his first degree murder conviction, i.e., that the state failed to prove that he shot the victim with the specific intent to kill during the perpetration of an armed robbery. We expressly rejected that contention in our disposition of Argument No. V, supra. We reject it again in analyzing the proportionality of the sentence in light of Enmund.
The jury's finding that the murder was committed during the perpetration of an armed robbery is clearly supported by the evidence. The valuables which the victim had carried with him on the day of the robbery, including $230 cash and a .38 caliber pistol, were missing from the victim's body. Witnesses testified that the defendant had threatened to rob the victim, "shoot him in the back, and throw him in a road ditch," and that he stated, "The old SOB is dead and there isn't any witnesses," when he was told that he was being sought by police in connection with the killing. Applying the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the evidence was such that any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found each essential element of the crime beyond a reasonable doubt. Unlike the defendant in Enmund, the evidence in this case established that the defendant "intended to take life, attempted to take life, and actually took life."[15]
In reviewing other cases from the same jurisdiction, the only case in which the death penalty was imposed in Rapides Parish since our present death penalty law took effect on January 1, 1976 was State v. Felde, 422 So.2d 370 (La.1982). The defendant in Felde was convicted of first degree murder for shooting to death a Shreveport policeman. In recommending the death penalty, the jury found as its sole aggravating circumstance that the defendant had killed a policeman who was acting in the line of duty. The defense urged was one of "post-traumatic stress syndrome" arising out of the defendant's service in Vietnam, and the facts of the case make it generally inapposite to the instant case.
All other cases where a first degree murder indictment had been returned in Rapides Parish were either plea bargained to lesser charges or the jury returned responsive verdicts of second degree murder or manslaughter. Our review of these cases has uncovered none which are similar to this case in fact, verdict, or sentence; nevertheless, the defendant asserts in his sentence memorandum that his sentence is disproportionate to the sentences rendered in State v. Willis (No. 175,409) and State v. Gray and Mikkelson (No. 173,544).
In State v. Willis, defendant Jimmy Wade Willis pleaded guilty to a reduced charge of manslaughter for the shooting death of Roy Cloud. The shooting grew out of an argument over a disputed debt of $90 which Willis allegedly owed to Cloud. Willis had reportedly stated sometime prior to the killing that he was going to have to kill Cloud because he owed Cloud some money and "wasn't about to pay it back." He was sentenced to twenty-one years.
In State v. Gray and Mikkelson, Lawrence Gray masterminded a plan whereby he and a friend, Richard Mikkelson, were to lure their victim to a deserted Army camp in rural Rapides Parish for the purpose of robbing him of $380 the two believed he was carrying. The apparent "bait" was the use of drugs. Once at the pre-planned site, Gray handed Mikkelson a .45 caliber automatic he had purchased specifically for the robbery and killing, and Mikkelson shot the victim once in the chest and once in the head. The evidence showed that both defendants had been using drugs and alcohol heavily before the incident. Gray pleaded *227 guilty to the reduced charge of manslaughter and was sentenced to twenty-one years. Mikkelson pleaded guilty to the reduced charge of second degree murder and was sentenced to life imprisonment without benefit of parole, probation or suspension of sentence.
We cannot say that the death sentence imposed in this case is disproportionate to the penalty imposed in similar cases in Rapides Parish. We are of the opinion that there are no cases sufficiently similar to the instant case to which we could make a fair comparison. In Willis and Gray and Mikkelson, the sentences imposed were derived from plea bargains with the state, and the cases never went to a jury for a determination of whether the death penalty was appropriate. Additionally, the facts of those cases are too disparate from those presented in this case to allow a fair comparison.
However, we have found cases from other jurisdictions which allow for a more fair comparison, and these cases justify imposition of the death sentence in this case.
In State v. Mattheson, 407 So.2d 1150 (La.1981), the 54 year old defendant shot and killed the victim with a sawed-off shotgun during a robbery of a beauty salon. Some twenty-five women were held captive during the robbery. We upheld the Orleans Parish jury's recommendation of death, noting in particular the circumstances surrounding the robbery, the defendant's significant prior criminal record (which included three prior armed robbery convictions), and the advanced planning which had gone into this particular crime.
In State v. Williams, 383 So.2d 369 (La. 1980), the defendant killed a security guard with a sawed-off shotgun during a grocery store robbery, and two other persons were injured. We upheld the recommendation of the East Baton Rouge Parish jury that the defendant be sentenced to death, despite the fact that the defendant suffered from a drug problem and had no significant prior criminal history. We also noted that at the time of the defendant's conviction, there had been handed down three prior death sentences in East Baton Rouge Parish, and all of those cases involved murders committed in the perpetration of armed robberies.
In our opinion, the death penalty is not disproportionate to the penalty imposed in these similar cases where the jury found armed robbery as an aggravating circumstance, and considering the circumstances surrounding the commission of this crime and the characteristics of this defendant. This case involved a premeditated, calculated robbery and murder. There is no evidence that the crime was either conceived or carried out under the influence of duress, drugs, alcohol, acute emotional distress or any other factor which might mitigate against imposition of the death penalty.[16] The defendant conceived this plan within two years of his release from Angola where he was serving a twenty-one year sentence for manslaughter. Approximately a week to ten days prior to the murder the defendant *228 made known his intention to rob the victim, "shoot him in the back, and throw him in a road ditch." The victim was abducted late at night, robbed of his valuables, and shot to death execution-style beside a deserted rural road. This is the type of defendant for whom the death sentence is appropriate.
For these reasons, in accordance with Rule 28, § 1(c), we have not found the death penalty disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

DECREE
The conviction and sentence of the defendant, Avery C. "Pete" Moore, are affirmed.
AFFIRMED.
MARCUS, J., concurs and assigns reasons.
MARCUS, Justice (concurring).
Since our appellate jurisdiction in criminal cases extends "only to questions of law," when a claim is made on appellate review that a person has been convicted on insufficient evidence, whether direct or circumstantial, our inquiry should be restricted to only whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. La. Const. art. 5, § 5(C) (1974). Jackson v. Virginia, 443 U.S. 307, 309, 99 S.Ct. 2781, 2783, 61 L.Ed.2d 560 (1977). In Jackson, the United States Supreme Court noted that this inquiry does not require a court to "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.... Once a defendant has been found guilty of the crime charged, the factfinder's roll as weigher of the evidence is preserved through a legal conclusion that upon judicial review all the evidence is to be considered in the light most favorable to the prosecution."
Accordingly, I respectfully concur.
NOTES
[1] Generally, assignments neither briefed nor argued are considered as abandoned. However, in cases where the death penalty has been imposed, we review such assignments as a matter of policy. State v. Brogdon, 426 So.2d 158 (La.1983); State v. Lindsey, 404 So.2d 466 (La.1981); State v. Monroe, 397 So.2d 1258 (La.1981). Our careful review of the record has revealed that none of these assignments represents reversible error. Consequently, they will be treated in an appendix to this opinion which will remain unpublished, yet nevertheless form part of the official record of this case.
[2] See State v. Wren, 425 So.2d 756 (La.1983) for a more detailed analysis of the testimony of Deputy Vanderhoeven. In Wren, we affirmed a ruling of the trial court overruling the motions of Tommy Wren and Vincent Orlando, two defendants also charged with the murder of Harold Austin, which had sought to suppress the testimony of Vanderhoeven because he had undergone hypnosis in the hopes of refreshing his memory as to the night of the incident. See also Argument No. II, infra.
[3] Apparently, this vehicle belonged to Linda Reed, a friend of the defendant. The box of ammunition was found in a suitcase which belonged to Avery Moore.
[4] The defendant does urge this in his sentence review memorandum as a ground for reversal of the death sentence, and we will necessarily examine this contention in accordance with Supreme Court Rule 28, § 1(a) in determining whether the death sentence was imposed under the influence of "passion, prejudice or other arbitrary factors." A "death qualified" jury cannot constitutionally impose or recommend a death sentence. cf. Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); see penalty phase review, infra.
[5] Acts 1968, Ex.Sess., No. 13, § 1, emerg. eff. Dec. 27, 1968, at 1:00 p.m.
[6] In oral argument before this court, defense counsel was questioned expressly from the bench as to whether there were any facts present in this case which might distinguish it from Wren. Specifically, counsel was asked whether during trial Vanderhoeven had testified as to any facts which had been hypnotically-induced, i.e., had the hypnosis caused him to testify at trial as to any facts which were unknown before he had been hypnotized. Counsel replied with an unequivocal, "No."
[7] By this assignment, the defendant also urges that imposition of the death penalty under the facts of this case is unconstitutional in light of the recent opinion of the United States Supreme Court in Enmund v. Florida, ___ U.S. ___, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). The defendant also urges on the issue of the death sentence that the evidence is insufficient to establish the existence of any of the requisite aggravating circumstances, particularly the finding of the jury that the crime had been committed in an especially cruel manner. These arguments will be addressed more fully in our review of the penalty phase of the trial, infra.
[8] In Graham, we noted the difference between "direct" and "circumstantial" evidence. While much of the evidence in this case arose from the direct observations of the witnesses, the evidence was introduced in furtherance of a proposition other than the mere truth of the fact asserted, i.e., the evidence was introduced to prove that the defendant was the killer. cf. 422 So.2d at 129-130.
[9] Even if the defendant did not fire the fatal shot, he was clearly a principal who shared with the actual killer the specific intent to kill the victim. LSA-R.S. 14:24; State v. Holmes, 388 So.2d 722 (La.1981); State v. McAllister, 366 So.2d 1340 (La.1979). Even if another of the occupants of the car actually pulled the trigger, the evidence adduced at trial was such that any rational trier of fact could have concluded that the defendant had the specific intent to rob and kill the victim. He was therefore properly convicted of first degree murder.
[10] The defendant in Graham put on evidence in an attempt to show affirmatively that someone else had committed the murder.
[11] The defendant, along with two accomplices, pleaded guilty to killing his wife. The woman had been insured for $70,000 prior to her death, and her beaten and burned body was found in the burned-out wreckage of her car alongside a rural Grant Parish road. The plan was to make it appear as though the woman had died in an accident.
[12] La.C.Cr.P. art. 905.3 provides:

"A sentence of death shall not be imposed unless the jury finds beyond a reasonable doubt that at least one statutory aggravating circumstance exists and, after consideration of any mitigating circumstances, recommends that the sentence of death be imposed. The jury shall be furnished with a copy of the statutory aggravating and mitigating circumstances."
La.C.Cr.P. art. 905.4 lists the following aggravating circumstances:
* * * * * *
"(a) the offender was engaged in the perpetration or attempted perpetration of aggravated rape, aggravated kidnapping, aggravated burglary, aggravated arson, aggravated escape, armed robbery, or simple robbery;
(b) the victim was a fireman or peace officer engaged in his lawful duties;
(c) the offender was previously convicted of an unrelated murder, aggravated rape, or aggravated kidnapping or has a significant prior history of criminal activity;
(d) the offender knowingly created a risk of death or great bodily harm to more than one person;
(e) the offender offered or has been offered or has given or received anything of value for the commission of the offense;
(f) the offender at the time of the commission of the offense was imprisoned after sentence for the commission of an unrelated forcible felony;
(g) the offense was committed in an especially heinous, atrocious, or cruel manner; or
(h) the victim was a witness in a prosecution against the defendant, gave material assistance to the state in any investigation or prosecution of the defendant, or was an eye witness to a crime alleged to have been committed by the defendant or possessed other material evidence against the defendant;
(i) the victim was a correctional officer or any employee of the Louisiana Department of Corrections who, in the normal course of his employment was required to come in close contact with persons incarcerated in a state prison facility, and the victim was engaged in his lawful duties at the time of the offense."
* * * * * *
[13] Compare Zant v. Stephens, supra. The question certified was: "What are the premises of state law that support the conclusion that the death sentence in this case is not impaired by the invalidity of one of the statutory aggravating circumstances found by the jury?" Stephens involved a situation where the jury recommended the death penalty on the basis of two statutory aggravating circumstances, one of which proved facially unconstitutional as too vague. Arnold v. State, 236 Ga. 534, 224 S.E.2d 386 (Ga.1976). The Georgia Supreme Court answered the question certified by finding that the evidence supported the existence of at least one constitutionally-valid aggravating circumstance. The court ruled further that the constitutional invalidity of one aggravating circumstance should not bar, at least not under Georgia law, imposition of the death penalty in this particular case because the evidence upon which the jury had found the constitutionally-invalid aggravating circumstance had a relevance and ground for admissibility independent of the statutory aggravating circumstance upon which the jury had relied, and therefore did not inject into the penalty proceeding an arbitrary factor. 297 S.E.2d at 4.

As we noted in Sawyer, the Stephens case is distinguishable. Neither Sawyer nor the instant case involved a constitutionally-invalid aggravating circumstance.
[14] We also noted in Sawyer that the facts of the case required our discussion of whether the introduction of evidence by the state at the penalty phase in support of an unproved aggravating circumstance (a prior Arkansas conviction for involuntary manslaughter) introduced into the penalty proceeding an arbitrary factor which might have misdirected the jury's sentencing discretion. We ultimately determined that it did not. 422 So.2d 102-104.

We find the circumstances presented in this case distinguishable from Sawyer. In our opinion, the finding of the jury that the defendant had been engaged in the perpetration of an aggravated kidnapping and that the murder had been committed in an especially cruel manner were based solely on the evidence adduced at trial and were not based on any attempt by the state to prove in the penalty proceeding that these aggravating circumstances actually existed. In fact, in his argument at the penalty phase, the prosecutor repeatedly urged the jury to find only armed robbery as an aggravating circumstance. La.C.Cr.P. art. 905.4(a). Since there was introduced no evidence in support of these unproved aggravating circumstances and no argument furthered in their support, we find the existence of no arbitrary factor which may have incited the passions of the jury, prejudiced the defendant, or weighed unfairly in the jury's deliberations.
[15] See n. 9, supra. Even if the defendant were not the actual trigger man, Enmund would still not preclude imposition of the death penalty in this case. The evidence adduced at trial was such that any rational trier of fact could have found, beyond a reasonable doubt, that the defendant shared with the actual killer the specific intent to rob and kill the victim. Enmund precludes imposition of the death penalty where the robber "neither took life, attempted to take life, nor intended to take life."
[16] See La.C.Cr.P. art. 905.5 which sets out the following mitigating circumstances which the jury must consider, in accordance with La.C. Cr.P. art. 905.3, before recommending a sentence of death:

* * * * * *
"(a) The offender has no significant prior history of criminal activity;
(b) The offense was committed while the offender was under the influence of extreme mental or emotional disturbance;
(c) The offense was committed while the offender was under the influence or under the domination of another person;
(d) The offense was committed under circumstances which the offender reasonably believed to provide a moral justification or extenuation for his conduct;
(e) At the time of the offense the capacity of the offender to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication;
(f) The youth of the offender at the time of the offense;
(g) The offender was a principal whose participation was relatively minor;
(h) Any other relevant mitigating circumstance."
Not only did the jury fail to find any of these mitigating circumstances applicable in this case, there was little, if any, evidence in the record from which the presence of such circumstances could be inferred.