425 So.2d 756 (1983)
STATE of Louisiana
v.
Tommy WREN.
STATE of Louisiana
v.
Vincent ORLANDO.
No. 82-K-1619.
Supreme Court of Louisiana.
January 10, 1983.
Charles J. Yeager, Kennedy & Yeager, B. Dexter Ryland, Garrett, Ryland & Nunnally, Alexandria, for relators.
*757 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Edwin O. Ware, Dist. Atty., R. Greg Fowler, Asst. Dist. Atty., for respondent.
BLANCHE, Justice.
Defendants Tommy Wren and Vincent Orlando were charged by grand jury indictment with aggravated kidnapping, a violation of LSA-R.S. 14:44, and first degree murder, a violation of LSA-R.S. 14:30, for the abduction and killing of Harold Austin. The defendants moved to suppress the testimony of Rapides Parish Sheriff's Deputy Bruce Vanderhoeven, an eyewitness who had seen the defendants on the night of the incident, because he had undergone hypnosis. It was hoped that the hypnosis would "refresh" Vanderhoeven's memory so that he would be able to identify a woman whom he had seen with the defendants that night. Vanderhoeven had positively identified Wren and Orlando on two occasions prior to the hypnosis; nevertheless, the defendants assert that Vanderhoeven's recollection has become so tainted by the hypnosis that his testimony is no longer reliable and should therefore be inadmissible. The trial court denied the motion, and we granted writs to examine the propriety of that ruling.
The facts of this case developed as follows: In the late evening of January 17, 1982, Deputy Vanderhoeven was on routine patrol in Tioga, Louisiana, a small community a few miles north of Alexandria/Pineville. He stopped his patrol car across the street from a Shop-Mor convenience store and observed a car in the parking lot about fifty yards from where he had come to a stop. There were four persons in the car, and a fifth person at the front of the store, apparently locking the door. The man then hurried away and entered the right rear door of the car. Vanderhoeven was able to see the man's face for a few seconds and believed him to be Michael Ebey.
The car drove off, and Vanderhoeven followed, radioing a request that another unit check the store. The other patrol car reported the store to be locked for the evening, and Vanderhoeven broke off his surveillance. He described the five occupants as follows: the driver was an elderly white male with a receding hairline and glasses; in the right front seat was a white woman with a short, full hairdo; in the left rear seat was Tommy Wren, a white male who Vanderhoeven knew from a previous arrest; in the right rear seat was the white male he had believed to be Michael Ebey; in the middle rear, slumped low, was an unidentified passenger. A license check showed the car to belong to Avery Moore of Tioga. Still troubled by the incident, Vanderhoeven returned to the Shop-Mor and found the cash drawer open and the car of the store proprietor parked at the far end of the lot with the driver's door open. A short time later, the body of Harold Austin, the proprietor of the Shop-Mor, was discovered alongside a rural road not far from Tioga. Austin had been shot once in the chest.
Later, at about 2:15 a.m., Vanderhoeven was called to the Tioga substation to aid in the investigation and gave the above statement of facts to the investigating officers. Vanderhoeven and several other deputies then went to Michael Ebey's residence, where they discovered that Ebey had a beard and was on crutches from recent knee surgery. This did not comport with Vanderhoeven's prior identification, and he told the other officers that it was not Ebey who he had observed running from the store to the car. The officers did discover that Tommy Wren was Ebey's roommate, and further investigation revealed that Avery Moore, the owner of the car in which all the suspects were riding, lived with a man named Vincent Orlando. The focus of the investigation turned to Wren, Moore, and Orlando as the primary suspects. The next morning, at about 6:00 a.m., Vanderhoeven was shown pictures of Vincent Orlando, who he identified as the man he had seen hurrying from the store to the car, and Avery Moore, who he identified as the driver. At the time of the identifications, Vanderhoeven was aware that the two were suspects in the murder.
On January 29, 1982, Vanderhoeven gave an additional statement which was largely *758 repetitive of the first and identified photographs of the car belonging to Avery Moore. He also selected photographs of Wren and Orlando out of a photographic lineup. Much later, on March 6, 1982, Vanderhoeven was hypnotized by a state trooper in an attempt to identify the woman passenger. While under hypnosis, Vanderhoeven described the man who had run from the store to the car as about 40 years old, tall, slender, and dark complected with kinky hair. He was able to describe the female passenger as white, slim, with full short hair and wearing a white sweater.
At the hearing on the motion to suppress, Vanderhoeven testified that the hypnosis did not make any contribution to his ability to identify the occupants of the car. His identifications after hypnosis were substantially the same as they were before. He stated that he was certain that Orlando, Wren, and Moore were three of the persons in the car that night. The defendants' motion urged that Vanderhoeven be declared incompetent to give any testimony, relying principally on their expert witness, Dr. Bernard Diamond, who testified extensively concerning the increased tendency of persons who have been hypnotized to be susceptible to suggestion and "confabulation."
Dr. Diamond testified that a photographic lineup conducted before or after a hypnotic session impaired what would otherwise be a reliable and trustworthy identification because the hypnosis would render the witness uncertain as to whether the identification imprinted in his mind had its origins in the original visual memory or was merely a memory of the photograph which had been imprinted by the hypnosis. Dr. Diamond believed that the confusion wrought by the hypnosis had transformed Vanderhoeven from an honest and forthright witness to one who had become intransigent in his belief as to the accuracy of his identification because the identification had become "frozen" in his memory due to the hypnosis.
However, on cross-examination, Dr. Diamond did admit that Vanderhoeven's statements prior to the hypnosis and those adduced during and after the hypnosis were essentially the same. He also admitted that repeated interrogation or repeated photographic lineups could have the same suggestive effect on an identification as hypnosis could. Finally, Dr. Diamond did concede that the reliability of eyewitness testimony was always open to question, whether hypnotically induced or not.
In denying the motion to suppress, the trial judge assessed Vanderhoeven as being straightforward and direct. In his view, any contamination of Vanderhoeven's testimony by the hypnosis was a factual issue going to the weight to be accorded his testimony rather than to its admissibility. We are of the opinion that Vanderhoeven has not been rendered by the hypnosis as incompetent to testify as to his observations on the night of the incident. Since Vanderhoeven's original identification of the defendants had been certain and was not enhanced in any way by the hypnosis, we find it unnecessary to assess squarely the admissibility of hypnotically-induced testimony in criminal cases, i.e., where facts are elicited under hypnosis which were otherwise unknown or not previously revealed by the witness prior to the hypnosis. Here, the hypnosis produced no facts which were not already known to the investigating officers. Accordingly, we affirm the ruling of the trial court.
The defendants argue that there is no objective scientific criteria by which one can distinguish between Vanderhoeven's true memory and what may have been inserted under hypnosis; therefore, there will always exist some degree of contamination of his memory. On the other hand, the state maintains that even if the hypnosis tainted Vanderhoeven's testimony, there does exist an independent basis to establish the accuracy of his identification of Orlando and Wren, since nothing was obtained through the hypnotic session that was inconsistent with any of Vanderhoeven's prior statements. The state further asserts that skillful cross-examination of Vanderhoeven could highlight any inconsistencies in his testimony and cast doubt on his credibility *759 due to the hypnosis. We agree with the state's assessment.
This issue is res nova in this state; however, the issue has been litigated extensively in other courts. Many of those courts have held that hypnotically induced testimony is admissible. The courts have generally reasoned that testimony of a witness whose memory has been revived through hypnosis should be treated like any other "recollection refreshed." That the witness had his memory enhanced or refreshed through hypnosis or by other suggestive means should be a matter affecting credibility, not admissibility. The courts have presumed that skillful cross-examination will enable the jury to evaluate the effect of the hypnosis on the credibility of the witness. United States v. Adams, 581 F.2d 193 (9th Cir.1978), cert. denied, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683; State v. Hurd, 86 N.J. 525, 432 A.2d 86 (1981).[1]
The defendants have cited a legion of cases which they assert stand for the proposition that the hypnosis of Vanderhoeven renders him incompetent to testify at trial and renders all of his testimony inadmissible. See State v. Shirley, 31 Cal.3d 18, 181 Cal.Rptr. 243, 641 P.2d 775 (1982); State v. Mena, 128 Ariz. 226, 624 P.2d 1274 (1981); State v. Mack, 292 N.W.2d 764 (Minn.1980).[2] These particular cases have reasoned that the testimony of a witness who has undergone hypnosis to refresh his memory should be per se inadmissible in a criminal trial unless the hypnotic procedure used satisfies the standard for the admissibility of scientific evidence as set out in Frye v. United States, 293 F. 1013 (D.C.Cir.1923).[3]
In our opinion, those cases are distinguishable from the present case. As we noted earlier, we are not required to directly consider whether hypnotically-induced testimony is admissible in criminal trials because Vanderhoeven's hypnosis caused him to give no information which he had not already given. Therefore, under these circumstances and the Adams line of reasoning, supra, the issue of Vanderhoeven's hypnosis should go to the question of the proper weight to be accorded his testimony rather than to the question of its admissibility. We agree with the assertion that skillful cross-examination will enable the trier of fact to evaluate the effect of the hypnosis on Vanderhoeven's credibility. Additionally, since Vanderhoeven's first two statements provide an independent basis for corroboration of his hypnotic and post-hypnotic statements and identifications, any of the feared risks of "confabulation" and undue suggestion become insignificant. The defendant may always counter the proffered evidence with expert testimony highlighting any questions as to the reliability of Vanderhoeven's testimony due to the hypnosis, thereby casting doubt on his credibility.

*760 DECREE
For the foregoing reasons, the judgment of the trial court denying the defendants' motion to suppress the testimony of Bruce Vanderhoeven is affirmed. These consolidated cases are hereby remanded to the trial court for further proceedings in accordance with the law.
AFFIRMED.
CALOGERO, J., concurs in part, dissents in part and assigns reasons.
CALOGERO, Justice, concurring in part and dissenting in part.
I concur in the majority opinion insofar as it allows the witness, who has been hypnotized, to testify at trial to what he remembered and related prior to the hypnosis. This seems to be the emerging consensus of other jurisdictions which have considered the issue, even those jurisdictions which exclude hypnotically-induced testimony. Collins v. Superior Court, 132 Ariz. 180, 644 P.2d 1266 (1982); People v. Wallach, 110 Mich.App. 37, 312 N.W.2d 387 (1981); State v. Koehler, 312 N.W.2d 108 (Minn.1981); Commonwealth v. Taylor, 294 Pa.Super. 171, 439 A.2d 805 (1982).
However, insofar as the majority opinion permits a witness to testify to knowledge he acquired after the hypnosis or by virtue of the hypnosis, I dissent. While the majority says that it is not addressing the question of hypnotically-induced information, they nevertheless hold that the witness can testify concerning an identification he made of the defendants after the hypnosis and he can give at trial the more detailed description which only after the hypnosis he was able to recite.
Therefore, while I agree that Deputy Vanderhoeven should be able to testify concerning the identifications he made and the descriptions he gave prior to the hypnosis, I do not agree that he should be able to testify concerning post-hypnosis identifications or descriptions.
For these reasons, I concur in part and dissent in part.
NOTES
[1] Cf. United States v. Awkward, 597 F.2d 667 (9th Cir.1979), cert. denied, 444 U.S. 885, 100 S.Ct. 179, 62 L.Ed.2d 116; United States v. Miller, 411 F.2d 825 (2nd Cir.1969); United States v. Narciso, 446 F.Supp. 252 (E.D.Mich. 1977); Chapman v. Wyoming, 638 P.2d 1280 (Wyo.1982); Clark v. State, 379 So.2d 372 (Fla. App.1980); People v. Smrekar, 68 Ill.App.3d 379, 24 Ill.Dec. 707, 385 N.E.2d 848 (1979); People v. Hughes, 99 Misc.2d 863, 417 N.Y.S.2d 643 (1979); State v. McQueen, 295 N.C. 96, 244 S.E.2d 414 (1978); Creamer v. State, 232 Ga. 136, 205 S.E.2d 240 (1974); State v. Jorgensen, 8 Or.App. 1, 492 P.2d 312 (1971); Harding v. State, 5 Md.App. 230, 246 A.2d 302 (1968), cert. denied, 395 U.S. 949, 89 S.Ct. 2030, 23 L.Ed.2d 468 (1969).
[2] See also Commonwealth v. Nazarovitch, 496 Pa. 97, 436 A.2d 170 (1981); Polk v. State, 48 Md.App. 382, 427 A.2d 1041 (1981); People v. Tait, 99 Mich.App. 19, 297 N.W.2d 853 (Md. App.1980); People v. Blair, 25 Cal.3d 640, 15 Cal.Rptr. 818, 602 P.2d 738 (1979); People v. Hangsleben, 86 Mich.App. 718, 273 N.W.2d 539 (1978); Greenfield v. Robison, 413 F.Supp. 1113, (D.Va.1976); Rodriguez v. State, 327 So.2d 903 (Fla.1976); Jones v. State, 542 P.2d 1316 (Okla.Cr.App.1975); Emmett v. State, 232 Ga. 110, 205 S.E.2d 631 (1974); State v. Pierce, 263 S.C. 23, 207 S.E.2d 414 (1974); Greenfield v. Commonwealth, 214 Va. 710, 204 S.W.2d 414 (1974); People v. Harper, 111 Ill.App.2d 204, 250 N.E.2d 5 (1969); State v. Harris, 241 Or. 224, 405 P.2d 492 (1965).
[3] Frye would require that in order for hypnotically-induced testimony to be admissible in criminal trials, it must be sufficiently established that the reliability of such testimony has gained "general acceptance" in the scientific community.