UNITED STATES of America, Plaintiff-Appellee,

v.

Joe Corona VALDEZ, Defendant-Appellant.

No. 82–1700.

United States Court of Appeals, Fifth Circuit.

Jan. 3, 1984.

George Scharmen, San Antonio, Tex., for defendant-appellant.

Sidney Powell, Joseph Casseb, Asst. U.S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before RUBIN, TATE and JOLLY, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

We consider the admissibility of an identification of the defendant made by a law enforcement officer after undergoing hypnosis. The officer had seen the defendant a number of times during the investigation and knew him to be a suspect but had previously been unable to identify him. Under hypnosis the officer identified the defendant as the person he had earlier seen at the scene of the crime. He later identified the defendant in court. We hold that it was improper to admit his post-hypnotic testimony.

I.

On February 18, 1981, H.E. Butt, owner of HEB Grocery Company, received a letter threatening to poison food sold in his grocery store unless he placed $125,000 in a can situated in a spot designated on a sketch of a roadside rest area about nine miles from Eagle Pass, Texas. Agents of the Federal Bureau of Investigation, the Texas Department of Public Safety, and the Texas Rangers began surveillance of the rest area. Using mesquite trees and brush, they built a camouflaged shelter about sixty yards from the drop site. Texas Rangers Jackson and Haralson secreted themselves in the shelter. Haralson took money to the drop site and, following instructions in the note, placed it inside a lard can that he found buried at the base of a utility pole in a pasture area separated by a fence from the rest area.

On a Sunday, five days later, while hiding in the camouflaged shelter, the Texas Rangers saw a number of vehicles stop at the rest area. As vehicles left the rest area, other law enforcement officers noted their license numbers. Several of them were identified, one as belonging to Joe Valdez.

Jackson and Haralson saw several people use a stile to cross the fence into the pasture adjacent to the park for the apparent purpose of answering a call of nature. They saw one man walk between the drop site and their place of concealment, look in their direction, and then disappear into the brush in a direction opposite from the drop site. Neither officer considered this important to their investigation at the time, and neither could identify the man.

No one picked up the money in the lard can. The agents decided not to interview any of the owners of the vehicles that had been identified as having been parked at the rest area because of the risk that this might antagonize the extortionist. Instead, they awaited the receipt of further communication from him.

A few weeks later, Butt received a second extortion letter directing that money be left at another drop site. From a plane overhead, FBI agents maintained surveillance of the designated area on the day when the letter directed that the money be left there. At 8:30 a.m., they observed a pickup truck with a white top and a green body parked beside an abandoned house on property adjacent to the pick-up site. This truck was later identified as belonging to Valdez. The agents saw no other vehicles near the drop site. Again, the money was never picked up.

Knowing that Valdez's truck was the only vehicle that had been identified as being at both drop sites, Texas Ranger Jackson interviewed Valdez at his place of employment, the HEB Grocery Store in Carrizo Springs. After being informed of his rights, Valdez stated that he had been at a ranch near the second drop site on his day off from HEB, Tuesday, March 24, between 9:00 and 9:30 a.m., and had returned at 11:00 a.m. to feed the dogs and goats on the ranch. Valdez followed the

agents to the sheriff's office, where he provided FBI agents fingerprints, palm prints, and handwriting exemplars which followed the text of the extortion letters dictated to him by an agent. He agreed to return to submit to a polygraph examination later that afternoon. Jackson arranged for a polygraph operator to travel a considerable distance to administer the test, but, when Valdez returned, he refused to submit to the examination. Jackson became indignant and cursed Valdez, but Valdez still refused the test.

FBI fingerprint experts found Valdez's right palm print on the first extortion note and his left palm print on the second one. An FBI fingerprint specialist later testified that these prints had been made by the heel of the palm, and that a person under stress is more likely to perspire and leave a palm or fingerprint. One of the letters had at least a hundred finger and palm prints of someone other than Valdez.

A few days later, FBI agent Moses Alaniz and Ranger Jackson met Valdez at the ranch near the second drop site to take some photographs of his truck and the area. During their conversation, the agents asked Valdez if he knew any of the people responsible for the letters. He said that he did not, yet appeared very nervous. When asked if he had been threatened, Valdez did not answer.

Several days later, Valdez asked Jackson to meet him at Valdez's home in Carrizo Springs. When Jackson and Alaniz arrived, Valdez took them to an abandoned house near the second drop site. Inside, Valdez showed them a cardboard box containing notebook paper, folders, and envelopes that he said he had found there two or three days after last speaking with Jackson. (A previous search of the house had not revealed these items.) Valdez said he thought that the box might contain something similar to the paper of the extortion notes, and that the material in the box might be important to the case. The agent

who dictated the extortion letters to Valdez for handwriting exemplars testified that he had been careful to prevent Valdez from seeing the letters. When asked how he knew what the notes had been written on, Valdez replied, "Well, I figured it was some kind of white paper." Actually, the paper in the box was similar, but not identical, to that on which the two extortion notes were written.

At none of the various interviews with Valdez did Ranger Jackson recall ever having seen Valdez before interviewing him at the HEB grocery. After the investigation had focused suspicion on Valdez, Jackson, Haralson, and FBI agent Curtis Hunt were hypnotized in an effort to refresh their memories. Immediately before undergoing hypnosis, Jackson reported recalling only that a green and white pickup had stopped at the first drop site; he remembered nothing of the truck's driver or his activities. At the trial, however, Jackson testified that, on March 1, when he and Haralson were in hiding at the rest area, he saw Valdez emerge from the pickup truck and sit on a bench in the rest area smoking a cigarette and looking around. Valdez entered the pasture, according to Jackson's testimony, and walked in the direction of the camouflaged hiding place until he came within forty feet of it. Jackson testified that Valdez then "broke off to the right into the brush," and surmised that Valdez must have detected the blind. Jackson said he later saw Valdez's truck leave the area. This testimony is consistent with statements Jackson had made during his hypnosis. Haralson never was able to identify Valdez. No one other than Jackson identified him as having approached the hiding place or the first drop site.

## II.

Numerous state courts admit testimony influenced by previous hypnosis, viewing the procedure as merely affecting credibility.[1] These courts consider the testimony a

1. *Harding v. State,* 5 Md.App. 230, 246 A.2d 302 (1968); *United States v. Narciso,* 446 F.Supp. 252 (E.D.Mich.1977); *Clark v. State,* 379 So.2d 372 (Fla.Dist.Ct.App.1979); *Creamer v. State,* 232 Ga. 136, 205 S.E.2d 240 (1974); *State v. McQueen,* 295 N.C. 96, 244 S.E.2d 414 (1978); *State v. Glebock,* 616 S.W.2d 897 (Tenn.Crim.App.1981); *Chapman v. State,* 638 P.2d 1280 (Wyo.1982); *see also State v. Wren,*

present recollection of past events, refreshed by hypnosis as it might be refreshed by reference to a prior statement or some other stimulus. In this view, traditional legal devices such as cross examination, expert testimony on the inherent risks of hypnosis, and cautionary instructions enable the jury to evaluate the credibility of previously hypnotized witnesses.[2]

Other courts appraise the jury's ability to assess the credibility of post-hypnotic testimony more skeptically. They require the trial judge to make an initial ruling on admissibility and to exclude the testimony unless the prosecution demonstrates that it employed rigorous procedural safeguards to prevent the hypnotic creation of pseudomemories.[3] The New Jersey Supreme Court, following the recommendations of Dr. Martin T. Orne, enumerated six prerequisites to the admission of hypnotically refreshed recollections:[4] (1) the hypnotist must be a qualified psychiatrist or psychologist who has experience in the use of hypnosis; (2) the hypnotist "should" work independently, not as agent for either party to the litigation; (3) all information given to the hypnotist before the hypnosis session must be recorded; (4) before hypnosis, the subject must describe the facts to the hypnotist as he then remembers them; (5) all "contact" between the hypnotist and the subject must be recorded, preferably on videotape; and

(6) no person other than hypnotist and subject "should" be present during any "contact" between the two. Oregon adopted similar procedural requirements by statute in 1977.[5]

FBI guidelines for hypnosis differ significantly from these safeguards. The guidelines require the subject's written permission to hypnotize him. They permit "qualified" physicians and dentists to conduct hypnosis, and do not require that the hypnotist work independently. A specially trained FBI agent called a "hypnosis coordinator" is required to "participate in the hypnotic session;" he acts as "liaison" between the hypnotist and the subject under hypnosis, but he may not induce or terminate the hypnotic state. Apparently, the guidelines do not require that all communication between subject and hypnotist be recorded but only that the hypnotic session be recorded in its entirety. They apparently permit both the hypnotist and the hypnosis coordinator to receive unrecorded information before meeting the subject, and they do not require that the subject's pre-hypnotic recollections be recorded.[6]

Differing with both approaches, the California Supreme Court has found testimony enhanced by prior hypnotism untrustworthy for legal purposes, hence inadmissible regardless of procedures employed.[7] On the

---

425 So.2d 756 (La.1983). The Maryland Court of Appeals recently repudiated *Harding,* the earliest precedent for admitting post-hypnotic testimony. *State v. Collins,* 296 Md. 670, 682 & n. 1, 464 A.2d 1028, 1034–35 & n. 1 (1983).

**2.** Ruffra, *Hypnotically Induced Testimony: Should It Be Admitted?* 19 Crim.L.Bull. 293, 298 (1983).

**3.** *Compare United States v. Awkard,* 597 F.2d 667 (9th Cir.1979) (post-hypnotic testimony admissible in criminal as well as civil trials) *with United States v. Adams,* 581 F.2d 193 (9th Cir.1978) (procedural safeguards must be employed); *State v. Hurd,* 86 N.J. 525, 432 A.2d 86 (1981); *Brown v. State,* 426 So.2d 76 (Fla.Dist. Ct.App.1983); *People v. Smrekar,* 68 Ill.App.3d 379, 24 Ill.Dec. 707, 385 N.E.2d 848 (1979); *Pearson v. State,* 441 N.E.2d 468 (Ind.1982); *State v. Beachum,* 97 N.M. 682, 643 P.2d 246 (1981); *People v. McDowell,* 103 Misc.2d 831, 427 N.Y.S.2d 181 (1980); *State v. Long,* 32 Wash.App. 732, 649 P.2d 845 (1982); *State v.*

*Armstrong,* 110 Wis.2d 255, 329 N.W.2d 386 (1983); *see also United States v. Miller,* 411 F.2d 825 (2d Cir.1969) (requiring prosecutors to notify defense counsel of hypnotic enhancement of witness's memory); *People v. Hughes,* 99 Misc.2d 863, 417 N.Y.S.2d 643 (1979) (requiring pretrial hearing on suggestiveness of hypnosis procedure).

**4.** *State v. Hurd,* 86 N.J. 525, 432 A.2d 86 (1981); *see* Orne, *The Use and Misuse of Hypnosis in Court,* 27 Intl. J. Clinical and Experimental Hypnosis 311, 335–36 (1979).

**5.** Or.Rev.Stat. § 136.675 (1981).

**6.** *Compare* Ault, *FBI Guidelines for Use of Hypnosis,* 27 Int.J. Clinical and Experimental Hypnosis 449–50 (1979) *with* Orne, *supra* note 4, at 335–36.

**7.** *People v. Shirley,* 31 Cal.3d 18, 181 Cal.Rptr. 243, 641 P.2d 775 (1982).

basis of scientific opinion, the California court concluded that hypnotism aggravates the unreliability of normal memory. Procedural safeguards may reduce the danger that hypnotists might intentionally suggest the recollection of helpful facts, but cannot eliminate other risks, for example, that witnesses will be unable to distinguish between actual memory and confabulation, the invention by the witness of logical data to supply unknown facts in order to make the hypnotically related story complete.[8] Moreover, the court doubted that theoretically adequate safeguards could be administered in practice. Special hearings and appeals regarding the procedures employed would escalate so greatly that "the game is not worth the candle."[9]

The California court therefore adopted the categorical rule that "the testimony of a witness who has undergone hypnosis for the purpose of restoring his memory of the events in issue is inadmissible as to all matters relating to those events, from the time of the hypnotic session forward."[10] The court would, however, admit a defendant's posthypnotic testimony to "avoid impairing the fundamental right of an accused to testify in his own behalf."[11]

### III.

The use of hypnosis in criminal investigation is based on an implicit theory of memory: the brain stores all the information received by the body's senses, and forgetting is simply the inability to retrieve stored information.[12] Hypnosis is a method of eliminating retrieval difficulties to give the hypnotized person access to the stored information.[13] Many memory theorists believe, to the contrary, that what appears to be recall is actually a constructive process in which information received after an event is integrated by the mind into the memory representation of that event.[14] According to this view, what appears to be a witness's recollection of the event itself may in fact be a composite made up of original recall, information learned from earlier and later events, suggestions received during hypnosis, and the witness's unconscious filling-in of missing details to make the story complete or logical or to fulfill the perceived desires of the hypnotist or someone else.[15] Whether hypnosis actually improves memory remains an open question among scientists.[16]

In deciding to exclude hypnotically influenced testimony, the New York and California appellate courts applied the test of general acceptance by the scientific community set forth sixty years ago by the District of Columbia Circuit in *Frye v. United States*.[17] The *"Frye* test," however, applies in terms to the admissibility of expert opinion and

**8.** *See* Orne, *supra* note 4, at 317; Kroger & Douce', *Hypnosis in Criminal Investigation,* 27 Int.J. Clinical and Experimental Hypnosis 358, 366 (1979); Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness,* 68 Cal.L.Rev. 313, 335 (1980). These authors agree that even experienced hypnotists can neither prevent confabulation nor detect it with certainty.

**9.** 31 Cal.3d at 39, 181 Cal.Rptr. at 256, 641 P.2d at 787.

**10.** 31 Cal.3d at 66–67, 181 Cal.Rptr. at 272, 641 P.2d at 804; *accord State v. Mena,* 128 Ariz. 226, 624 P.2d 1274 (1981); *People v. Quintanar,* 659 P.2d 710 (Colo.App.1982); *Commonwealth v. Nazarovitch,* 496 Pa. 97, 436 A.2d 170 (1981); *State v. Collins,* 296 Md. 670, 464 A.2d 1028 (1983); *People v. Gonzales,* 108 Mich.App. 145, 310 N.W.2d 306 (1981); *State v. Mack,* 292 N.W.2d 764 (Minn.1980); *People v. Hughes,* 59 N.Y.2d 523, 466 N.Y.S.2d 255, 453 N.E.2d 484 (1983).

**11.** 31 Cal.3d at 67, 181 Cal.Rptr. at 273, 641 P.2d at 805.

**12.** *See* Orne, *supra* note 4, at 321.

**13.** Putnam, *Hypnosis and Distortions in Eyewitness Memory,* 27 Int.J. Clinical and Experimental Hypnosis, 437, 439–40 (1979).

**14.** *See generally* F. Bartlett, *Remembering* 203–05, 309–13 (1964); *see also* Putnam, *supra* note 13, at 437; Orne, *supra* note 4, at 321 and authorities cited therein.

**15.** *See generally,* Diamond, *supra* note 7.

**16.** Putnam, *supra* note 13, at 438.

**17.** *People v. Hughes,* 466 N.Y.S.2d at 261, 267, 453 N.E.2d at 490, 496; *People v. Shirley,* 181 Cal.Rptr. at 251, 641 P.2d at 783 *applying Frye v. United States,* 293 F. 1013, 54 App.D.C. 46 (1923).

experimental data.[18] The issue here is not the admissibility of a hypnotist's observations or statements made by the witness during hypnosis but instead the admissibility of the testimony of a lay witness in a normal, waking state.[19] We do not, therefore, attempt to decide the unresolved question whether the Federal Rules of Evidence silently abolished or adopted the *Frye* test.[20]

Our evaluation instead considers three basic evidentiary precepts: first, the principle embodied in Federal Rules 402 and 601 that "all relevant evidence is admissible" and "every person is competent to be a witness," subject only to certain explicit exceptions; second, the jurisprudential rule that, in determining admissibility, the trial judge's discretion is wide (a rule based on the superior opportunity for insight available to trial judges); and finally, the limiting rule that even relevant evidence may be excluded if its probative value is substantially outweighed by such factors as "the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed.R. Evid. 403.

Post-hypnotic testimony can obviously be relevant, as Jackson's identification of Valdez shows. And we cannot say that it is always without probative value. In this case, however, the district court did not expressly weigh probative value against potential for prejudice. Admissibility was based instead on a rule-of-law decision that post-hypnotic testimony was admissible and the jury might assess credibility. We therefore examine whether the probative value of this hypnotically influenced testimony was outweighed by the dangers of unfair prejudice, jury confusion, or jury misapprehension.

The scientific consensus is that a subject's reactions while under hypnosis are characterized by eager suggestibility to even slight nuances in the hypnotist's words or manner,[21] a distorting desire to please the hypnotist,[22] and the subject's later inability to distinguish between memories existing before hypnosis and pseudomemories existing on account of hypnosis.[23] The hypnotist's influence on the subject may be completely unintentional.[24] As we have already mentioned, it is well-established in addition that hypnotized subjects engage in confabulation, the invention of details to supply unremembered events in order to make the witness's account complete, logical, and acceptable to the hypnotist.

The exact nature of the hypnotic state is not understood. It is a trance-like condition

---

**18.** "[W]hile courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye,* 293 F. at 1014. *See generally* Giannelli, *The Admissibility of Novel Scientific Evidence: Frye v. United States a Half-Century Later,* 80 Column.L.Rev. 1197 (1980).

**19.** *See* Note, *The Admissibility of Testimony Influenced by Hypnosis,* 67 Va.L.Rev. 1203, 1217 (1981). Professor Ruffra praises the view that *Frye* applies to post-hypnotic testimony as the "end product of the technique 'which cannot be disassociated from the underlying, scientific method.'" Ruffra, *supra* note 2, at 317. We nevertheless decline to apply a test designed for pseudo-scientific data in a manner that would render a lay witness incompetent to give previously admissible testimony.

**20.** *See United States v. Dorfman,* 532 F.Supp. 1118 (N.D.Ill.1981) (noting controversy); C. Wright & K. Graham, 22 *Federal Practice and Procedure* § 5168 (1978) (*Frye* test repealed by Federal Rules); *cf. State v. Williams,* 388 A.2d 500 (Me.1978) (*Frye* incompatible with state rules identical to Federal Rules). "According to the reasoning, if the proposed evidence meets the requirements of Rules 401 and 402, the trial judge has no power to fashion new exclusionary rules of evidence, and the testimony must be admissible." Ruffra, *supra* note 2, at 319 n. 164. Saltsburg & Redden discuss post-hypnotic testimony as expert-witness testimony excludable under Rule 702 if it will not assist the trier of fact to determine a fact in issue. According to this treatise, the Federal Rules did not disturb the *Frye* test. *Federal Rules of Evidence Manual* 452 (3d ed. 1982).

**21.** *E.g.,* Putnam, *supra* note 13, at 437.

**22.** Comment, *Hypnosis: A Primer for Admissibility,* 5 Glendale L.Rev. 51 (1983).

**23.** *E.g.,* Diamond, *supra* note 7, at 333; Orne, *supra* note 4, at 328–32; Kroger & Douce', *supra* note 7, at 366.

**24.** *See* authorities cited *supra* note 23.

induced by a hypnotist. Scientists have observed empirically that, in highly susceptible subjects, hypnosis is characterized by subsidence of the planning function (the subject loses initiative); redistribution of attention (the hypnotist can direct attention beyond the usual range consciously available to the subject); reduction in reality testing and tolerance for persistent reality distortion; increased suggestibility; role behavior (the subject will adopt a role suggested by the hypnotist and carry on complex activities corresponding to that role); and amnesia for what happened during the hypnotic state.[25]

Separating true memory from hypnotic pseudomemory is impossible for professionals trained in hypnosis and even the subjects themselves.[26] It can be no less difficult for laymen employing traditional legal methods. The proposition that the opportunity to cross-examine the previously hypnotized witness will allow the opposing party adequate opportunity to display the inaccuracy of his testimony [27] is rendered dubious by the nature of hypnotic influence. Once a witness makes a recitation under hypnosis, his confidence in that supposed memory—whether genuine or invented—is greatly strengthened.[28] The witness then may have an unshakeable subjective conviction that gives his account on the witness stand the imprimatur of absolute confidence. Indeed, in a criminal trial, the witness's resultant undue confidence might violate the defendant's constitutional right to confront and cross-examine adverse witnesses, for an absolute conviction in the accuracy of his memory might make it "impossible to cross-examine [the] witness in any meaningful way."[29] What is more, the jury may be so influenced by its suppositions concerning the process of hypnosis that revelation of the fact that a witness's testimony was influenced by hypnosis may give it even greater credence in the jury's eyes. The jury's assumptions concerning the nature of memory and the accuracy of hypnosis may make the testimony so prejudicial that its weight is impossible to overcome.

Procedural safeguards are based on the assumption that some reliable evidence may be elicited. But, as the California Supreme Court observed, it is doubtful that safeguards could be administered properly and prevented from becoming the major issue at most every trial. Moreover, no safeguards can prevent all unreliability.[30] Dr. Martin Orne, who first set forth the proposed safeguards, has stated that "no aspect of these safeguards can prevent subjects from confusing confabulation under hypnosis with actual previous memory."[31]

### IV.

In the present case, we consider only one kind of post-hypnotic testimony: the identification of a person known by the witness to be under suspicion, whom the witness had nevertheless been unable to identify before being hypnotized. No government witness could identify Valdez as having been present at the Eagle Pass rest spot. More important, no one could testify that, if he were there, he had crossed the fence into the pasture where the drop site was located and where the law enforcement agents were lying in their camouflaged hiding place. When Jackson interviewed Valdez a few weeks later, he had no recollection of having seen Valdez before. After several

---

**25.** E. Hilgard, *The Experience of Hypnosis* 6–10 (1968), quoted in Diamond, *supra* note 7, at 316. For a comparison of the suggestibility of hypnotized witnesses and non-hypnotized witnesses, see Putnam, *supra* note 13.

**26.** Orne, *supra,* note 4, at 17; Diamond, *supra,* note 7, at 333–34.

**27.** *See, e.g.,* Note, *Awakening from the Exclusionary Trance: A Balancing Approach to the Admissibility of Hypnotically Refreshed Testimony,* 61 Tex.L.Rev. 719, 726–29, 735–36 (1983).

**28.** *State v. Menas,* 624 F.2d at 1280; Kroger & Douce', *supra* note 7, at 367; Orne, *supra* note 4, at 332; Diamond, *supra* note 7, at 339.

**29.** *State v. Mack,* 292 N.W.2d at 769.

**30.** Diamond, *supra* note 7, at 332–42.

**31.** Orne, Affidavit for Amicus Curiae Brief in Opposition to Petition for Rehearing Before California Supreme Court at 6–7, *People v. Shirley,* 31 Cal.3d 18, 181 Cal.Rptr. 243, 641 P.2d 775 (1982), quoted in Ruffra, *supra* note 2, at 294 n. 8.

interviews with Valdez, Jackson still could not identify him until undergoing hypnosis. At trial, there was not a word of corroboration of Jackson's post-hypnotic testimony.[32] Valdez had been identified as the principal suspect before Jackson was hypnotized. In addition, Valdez had incurred Jackson's personal rancor. This enmity surfaced during hypnosis; immediately after his first reference to Valdez, Jackson said, "The son of a bitch comes in the pasture .... The son of a bitch is going to walk over us." Under these circumstances, confabulation alone would provide the likely bridge: the person must have been Valdez.[33]

Moreover, the procedures employed during the hypnotic session were unduly suggestive. In every particular, they were at variance with the safeguards required in New Jersey and Oregon. Several Texas Rangers, FBI agents, and an Assistant U.S. Attorney were present in addition to the hypnotist. Questions were directed to Jackson not only by the "mental health professional" who hypnotized him, but also by an FBI agent. Both had evidently received information about the events being investigated before the session began. During the hypnotic session, additional questions were proposed orally by yet another FBI agent in the room. Only some of the agents present were videotaped; whether others may have unintentionally suggested "recollections" cannot be determined.[34] Because those present did not record their knowledge and beliefs relative to the investigation, we cannot examine what recollections could be attributable to their subtle cues. The most obviously suggestive question put to Jackson referred to the "significant" green and white truck. An elaborate pre-induction discussion had already focused Jackson's attention on the truck, which Jackson presumably knew had been traced to Valdez.

One authority has observed that inaccuracy in hypnotic recall increases with the number and detail of questions; the least-distorted recollections are provided by free narration.[35] In all, nearly a hundred questions were put to Jackson. In addition, the confusion of true recollection and pseudomemory may be aggravated by the suggestion that post-hypnotic memory will be as vivid and detailed as hypnotic experience.[36] This suggestion was also imparted to Jackson.

As the Supreme Court explained in *Manson v. Brathwaite,* 432 U.S. 98, 102–114, 97 S.Ct. 2243, 2247–53, 53 L.Ed.2d 140, 146–154 (1977), due process and a fair trial can be denied by unduly suggestive identification procedures. Identification under such circumstances, moreover, is more potentially prejudicial than probative. These principles require the exclusion of an uncorroborated personal identification, made only after hypnosis, of a person clearly singled out for suspicion.

We do not formulate a per se rule of inadmissibility for cases not involving personal identification. In a particular case, the evidence favoring admissibility might make the probative value of the testimony outweigh its prejudicial effect. If adequate procedural safeguards have been followed, corroborated post-hypnotic testimony might be admissible. However, when, as here, a hypnotized subject identifies for the first time a person he has reason to know is already under suspicion, the post-hypnotic testimony is inadmissible whatever procedural safeguards were used to attempt to sanitize the hypnotic session.

---

**32.** Kroger & Douce' infer from the distorting tendencies of hypnotized subjects that "independent corroberation of any information obtained [is] absolutely essential." *Supra* note 8, at 371. "[H]ypnotically related evidence must be validated through careful independent investigation or it is useless! In short, hypnosis is not a modality designed to determine truth from deception." *Id.*

**33.** Strikingly similar facts are analyzed as a worst-case study in Orne, *supra* note 4, at 319.

**34.** The soundtrack of the videotape is inadequate to assess the suggestiveness of these agents' presence, for hypnotized subjects are susceptible to nonverbal cues as well as verbal ones. *See* Kroger & Douce', *supra* note 8, at 366.

**35.** *See* Orne, *supra* note 4, at 319–21.

**36.** Orne, *supra* note 4, at 320.

Our decision does not make incompetent a witness who has been hypnotized. Numerous courts permit a previously hypnotized witness to testify about "those matters which he or she was able to recall *and* relate prior to hypnosis."[37]  To guard against inherent dangers in the procedure, these courts require that pre-hypnotic memory be preserved in written, audiotaped, or videotaped form.  They also allow cross-examination and expert testimony to counter the possibility of changes in the witness's certainty.  If a sufficiently reliable method exists for the witness to separate pre-hypnotic memory from post-hypnotic pseudo-memory, such testimony may be admissible.

## V.

The government contends that, even if admitted in error, the identification of Valdez was harmless.  For present purposes, we assume that the error did not violate Valdez's constitutional rights and do not apply the harmless-beyond-reasonable-doubt test,[38] but are guided instead by the less demanding test in Federal Rule of Evidence 103, which provides, "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected . . . ."  Relying on Rule 103, we have refused to reverse a conviction unless an error in admitting evidence is shown to have exerted a substantial impact on the verdict.[39]  Some of our decisions have applied the harmless error test in weighing the effect of an error in admitting testimony,[40] but this ruling was inadvertent, and did not take into account the difference between a trial court's failure to observe an evidentiary rule and its failure to protect a constitutional right.  We, therefore, apply the Rule 103 criterion.

As we have shown in our previous factual summary, there was considerable evidence incriminating Valdez besides Ranger Jackson's testimony.  Valdez was at the second drop site on the date set for leaving the money there; he was the only person whose vehicle was identified as being at both drop sites; his right palm print was on the first extortion note and his left palm print was on the second note; there were 111 similar improper capitalizations in the first extortion letter and in Valdez's exemplar, 93 in the second extortion letter and its corresponding exemplar; and there were several identical misspellings as well as some similar misspellings in the letters and the exemplars.  (For example, in both the second letter and its exemplar "Vietnamese" is spelled "Vietnamees".)  In addition, it was shown that Valdez had a motive for the crime: as an employee of the HEB Grocery Company, he had received a poor performance rating in November 1980, and his scheduled raise had been postponed for ninety days; when he refused a transfer to another store, an outsider was hired for training, and Valdez was forced to step down as the number two man in his department.  Valdez offered the explanation that the raises of all employees had been suspended because of losses, when in fact the pay increase of only one other employee was delayed.

Valdez did, on the other hand, receive a raise from HEB Grocery Company in February 1981; he was a regular visitor to the

37. *State ex rel. Collins v. Superior Court,* 132 Ariz. 180, 644 P.2d 1266, 1295; *accord People v. Quintanar,* 659 P.2d 710, 713 (Colo.App. 1982); *Merrifield v. State,* 272 Ind. 579, 400 N.E.2d 146, 149 (1980); *State v. Wren,* 425 So.2d 756, 758 (La.1983); *People v. Wallach,* 110 Mich.App. 37, 312 N.W.2d 387, 404–05 (1981); *State v. Koehler,* 312 N.W.2d 108, 110 (Minn.1981); *State v. Beachum,* 97 N.M. 682, 643 P.2d 246, 252 (1981); *People v. Hughes,* 59 N.Y.2d 523, 466 N.Y.S.2d 255, 267–68, 453 N.E.2d 484, 496–497 (1983); *Commonwealth v. Taylor,* 294 Pa.Super. 171, 439 A.2d 805, 808 (1982); *State v. Glebock,* 616 S.W.2d 897, 905 (Tenn.Crim.App.1981).

38. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

39. *E.g., United States v. Cain,* 615 F.2d 380, 382 (5th Cir.1980) (hearsay error); *United States v. Gomez,* 529 F.2d 412, 417 (5th Cir.1976) (same).

40. *E.g., United States v. Martinez,* 588 F.2d 495, 499 (5th Cir.1979) (hearsay error); *United States v. Cook,* 557 F.2d 1149, 1155 (5th Cir. 1977) (erroneous admission of evidence more potentially prejudicial than probative); *United States v. Turquitt,* 557 F.2d 464, 471 (5th Cir. 1977) (erroneous admission of evidence of another crime).

ranch near the second drop site; he regularly went to the Eagle Pass Flea Market on Sundays; the Government stipulated that the handwriting on the extortion letters and envelopes was disguised and could not be identified as belonging to Valdez; the style of writing of Valdez's exemplars differed from that on the letters and envelopes; the Government could not determine whether they were written by a left- or right-handed person or by the same person or different people; many prints other than Valdez's were found on both letters and were not identified; and the only agent other than Jackson at the first drop site could not identify Valdez.

Jackson's testimony that Valdez not only stopped at the rest area, but also crossed the fence into the pasture, approached the drop site, appeared very close to the agents' camouflaged hiding place, suddenly veered off as if he had seen the agents, and disappeared into the brush as if to sneak away was certainly persuasive. Indeed, despite the other evidence available, all of which is summarized above, the Government went to great lengths to secure this identification, enlisting a hypnotist, an FBI examiner-agent, a camera operator, and numerous others who attended the hypnotic session. The Government evidently thought the testimony useful in its efforts to obtain a conviction.

■ The district judge concluded after the trial that, even with the hypnotically induced testimony, the evidence was insufficient to return the guilty verdict. Our opinion reversing this judgment relied on Ranger Jackson's testimony. *United States v. Valdez*, 685 F.2d 1384 (5th Cir.1982). We cannot now say, therefore, that the Government's effort was wasted, that the result would patently have been the same without Ranger Jackson's identification, and that Valdez was not harmed by that identification and the testimony concerning his alleged activities at the first drop site.

■ Our review of the record satisfies us, however, as it satisfied the panel of this court that reversed a directed verdict of acquittal in an unreported opinion, that the evidence admitted was sufficient to sustain the conviction. In view of the conclusion we have reached, we do not discuss questions raised concerning the jury charge.

For these reasons, the judgment of conviction is REVERSED. The case is REMANDED for further proceedings not inconsistent with this opinion.

E. GRADY JOLLY, Circuit Judge, concurring in part and dissenting in part:

I fully concur in the well researched and reasoned analysis of Parts II, III, and IV of the opinion. I respectfully dissent, however, from the conclusion of Part V, holding that the admission of the hypnotically enhanced testimony affected a substantial right of the defendant.

Because there was overwhelming independent evidence against Valdez and because the hypnotically enhanced identification testimony was insignificant when compared to the other evidence of guilt, I would hold that the admissibility of this testimony did not affect a substantial right of the defendant; indeed, I would hold that the testimony was harmless beyond a reasonable doubt.

The evidence clearly showed that Valdez had the necessary motive to commit the crime with which he was charged, that is, hostility toward his employer for criticism of his work and denial of a pay increase. Valdez admitted to being at the first drop site. He was also at the second drop site. His palm print was found on the first extortion note. His palm print was found on the second extortion note. There were more than 204 similarities between the handwriting on the two extortion notes and Valdez's handwriting exemplars. Additionally, without being shown the extortion notes by the investigating officers, Valdez apparently knew the kind of paper the notes had been written on. Surely the majority should be able to recognize that these links in the chain of evidence cannot be explained as mere coincidence; indeed, to any reasonable minded jury such evidence, unexplained as it was here, would be conclusive proof of culpability.

When compared with this overwhelming weight of evidence of guilt, the hypnotically enhanced testimony is of no significance or importance. The only hypnotically enhanced evidence was the identity of Valdez at the first drop site, where he later admitted he was. The elimination of this testimony that Valdez acted suspiciously at the first drop site does not add any strength to a claim of innocence, or, in different words, does not create a basis for a reasonable doubt of guilt. In short, it was harmless.

I would therefore affirm the judgment of the district court.